# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 6, 2014        Decided December 2, 2014

No. 13-7071

UNITED STATES EX REL. JOHN DOE,
APPELLANT

v.

STAPLES, INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00846)

*Joseph A. Black* argued the cause for appellant. With him on the briefs was *Joyce E. Mayers*.

*David W. Ogden* argued the cause for appellees. With him on the brief were *Daniel S. Volchok*, *D. Bradford Hardin Jr.*, *Gideon M. Hart*, *James L. Volling*, *John F. Henault Jr.*, *Robert P. Fletcher*, and *Leslie Paul Machado*. *John M. Peterson* entered an appearance.

Before: TATEL and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

2

TATEL, *Circuit Judge*: This False Claims Act case is about pencils—Chinese pencils, to be precise. Anonymous relator John Doe alleges that defendants—including three major office-supply retailers—imported pencils that they knew were made in China, but to avoid paying substantial antidumping duties imposed on Chinese-made pencils, falsely declared to United States Customs officials that they were made elsewhere in Asia. The district court determined that the essential elements of the alleged fraud were already in the public domain, and so, as required by the False Claims Act, dismissed the case for lack of jurisdiction. For the reasons set forth in this opinion, we affirm.

I.

Enacted in 1863 to fight rampant fraud in Civil War procurement contracts, the False Claims Act (FCA) remains the government's "primary litigative tool for combatting fraud." S. Rep. No. 99-345, at 2, 4 (1986). The FCA penalizes false claims for payment from the government, and, as alleged here, false statements to avoid payments owed to the government. *See* 31 U.S.C. § 3729(a)(1)(A) & (G). Since its enactment, the FCA has empowered not only the Attorney General, but also private citizens acting on the government's behalf—known as *qui tam* relators—to sue persons who defraud the United States. *Id.* § 3730(a) & (b)(1). If a *qui tam* relator initiates the suit, the government may elect to intervene and prosecute the action with the relator's participation. *Id.* § 3730(b)(2). If the government declines to intervene, the relator may proceed on his own, though the action remains "in the name of the Government." *Id.* § 3730(b)(1). In either case, the relator shares in any recovery. *Id.* § 3730(d). Because FCA defendants are liable for treble damages and relators can receive nearly a third of the pie, that share can amount to tens of millions of dollars. *Id.* & *id.* § 3729(a). The FCA's *qui tam*

provisions thus encourage private citizens to expose false claims and so serve as a critical supplement to government enforcement.

By the same token, however, the FCA can encourage opportunistic lawsuits based solely on information already known to the government. *See, e.g.*, *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (reviewing infamous *qui tam* action in which relator copied allegations of fraud from government's criminal indictment). Accordingly, "in an effort to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits," Congress established the FCA's jurisdictional provision—the so-called "public disclosure bar." *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010). Although Congress has amended this provision several times, the version of the public disclosure bar that governs this case strips courts of jurisdiction over *qui tam* suits that are "based upon the public disclosure of allegations or transactions" through certain channels—including, as relevant here, administrative reports and news media—unless the relator "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1986). An original source is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing [suit]." *Id.* § 3730(e)(4)(B).

This *qui tam* case involves an alleged fraud on the United States government through false statements made to U.S. Customs and Border Control (Customs) to avoid antidumping duties—protective tariffs imposed on goods priced below fair market value—applicable to Chinese-made pencils. *See* 68 Fed. Reg. 43082 (July 21, 2003) ("Certain Cased Pencils from the People's Republic of China"). Relator, a self-styled

pencil-industry insider, filed suit in the U.S. District Court for the District of Columbia, alleging that defendants Staples, OfficeMax, Target, and Industries for the Blind knowingly purchased Chinese-made pencils from suppliers in Indonesia, Hong Kong, and Vietnam, but when the pencils arrived in the United States, falsely declared to Customs that the pencils' country of origin was other than China.

According to the complaint, Relator learned of defendants' false representations by examining manifest data that all shippers must submit to Customs. By Relator's account, a company called PIERS Global Intelligence Solutions compiles this data in an online database, which includes shipments' designated country of origin and importer of record. With respect to the pencils' true country of origin, Relator alleged that "Chinese pencils can be readily identified by their overall appearance and quality that is a result of the unique manufacturing processes used in China." Compl. 8. Based on certain telltale characteristics, he asserted, defendants' pencil buyers would surely have known that their pencils were made in China "without the need for direct contact with the factories actually producing the pencils." *Id.* Relator also alleged that he confirmed the pencils' Chinese origin through his own investigation of defendants' foreign suppliers. With the help of pencil-industry informants, the investigation apparently revealed that defendants' suppliers either make no pencils themselves or do not make the pencils they sell to U.S. buyers. Relator ultimately grounded his allegations on the pencils' appearance, however, asserting with respect to each defendant's product that, "[b]ased on their physical characteristics, these pencils were produced in China." *Id.* at 13, 22-24.

After the government declined to intervene, defendants moved to dismiss the complaint for lack of jurisdiction and for

failure to state a viable FCA claim. In support of their jurisdictional argument, defendants invoked the FCA's public disclosure bar, contending that the material facts of the alleged scheme were already in the public domain. They also argued that Relator failed to demonstrate that he qualifies for the original-source exception to the bar.

The district court agreed, concluding that the essential elements underlying Relator's allegation of fraud—i.e., defendants' misrepresentations to Customs and the pencils' actual country of origin—were "both based on publicly disclosed information." *United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 40 (D.D.C. 2013). The court noted that Relator based his allegations regarding defendants' misrepresentations on the PIERS database, a form of "news media" within the meaning of the FCA that is "readily accessible to the public," and which itself derives from publicly available shipping information in the Customs manifest system. *Id.* As to the pencils' true country of origin, the district court observed that Relator based his allegations on the pencils' physical appearance, *id.* at 38, 40, explaining that the "giveaway characteristics" of Chinese pencils had already been described in publicly accessible reports produced by the United States International Trade Commission, which constitute "administrative reports" within the meaning of the FCA. *Id.* at 40-41. Finally, concluding that Relator failed to show that he qualifies as an original source of the information, the district court dismissed the case for lack of subject matter jurisdiction. *Id.* at 41-42.

Relator now challenges the district court's conclusions that his FCA claim is based on publicly disclosed information and that he failed to demonstrate original-source status. "We review de novo the district court's dismissal for lack of subject

matter jurisdiction." *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 40 (D.C. Cir. 2014).

## II.

Seeking to prevent suits "by those other than an 'original source' when the government already has enough information to investigate the case" or where "the information 'could at least have alerted law-enforcement authorities to the likelihood of wrongdoing,'" *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012) (citation omitted), the FCA's public disclosure bar blocks *qui tam* suits that are "based upon the public disclosure of allegations or transactions," 31 U.S.C. § 3730(e)(4)(A) (1986). In this circuit's seminal opinion on the public disclosure bar, *United States ex rel. Springfield Terminal Railway v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994), we explained that the government has "enough information to investigate the case" either when the allegation of fraud itself has been publicly disclosed, or when both of its underlying factual elements—the misrepresentation and the truth of the matter—are already in the public domain.

In *Springfield Terminal*, the relator alleged that an arbitrator working for the National Mediation Board had fraudulently billed the government for arbitration services never actually rendered. *Id.* at 647. After concluding that the allegations were "based upon" certain pay vouchers that had been publicly disclosed in a related civil action, the district court dismissed the case for lack of jurisdiction. *Id.* at 648. Reversing, we recognized that the relator had relied in part on public information, but explained that Congress sought to prohibit *qui tam* suits only when *both* essential elements of fraud—the false statement and the true facts—had been publicly disclosed. *Id.* at 655. We illustrated this principle with a simple algebraic formula: "[I]f X + Y = Z, Z represents the

*allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." *Id.* at 654. Because the publicly disclosed pay vouchers reflected only the false statement (the arbitrator's claim for payment) and not the true facts (the services actually rendered), we held that the public disclosure bar did not apply. *Id.* at 655-56. That said, we stressed that a *qui tam* action cannot be sustained where both elements of the fraudulent transaction—X and Y—are already public, even if the relator "comes forward with additional evidence incriminating the defendant." *Id.* at 655.

In this case, the parties agree that X, the alleged misrepresentation, is defendants' declarations to Customs that their imported pencils were made somewhere other than China. Relator, moreover, concedes that this information was publicly disclosed in the PIERS database. The only question, then, is whether Y, the alleged fact that defendants' pencils actually *were* made in China, was likewise in the public domain. Echoing the district court's conclusion, defendants argue that this fact was disclosed in two public reports produced by the United States International Trade Commission (ITC) before Relator brought this suit. Those reports, defendants maintain, constitute "administrative reports" within the meaning of the FCA and describe the physical characteristics of Chinese pencils, including many of the telltale characteristics that form the basis of Relator's charge that the pencils were made in China. According to defendants, then, both essential elements of the alleged fraud—X and Y—were already in the public domain. For his part, Relator agrees, as he must, that the ITC reports qualify as administrative reports within the meaning of the FCA. *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011) (explaining that "report"

maintains its "broad ordinary meaning" in the FCA). He insists, however, that the reports disclose insufficient information to demonstrate that defendants' pencils were made in China.

We agree with the district court and defendants. In his complaint, Relator detailed a series of physical characteristics that, he alleged, result from "unique manufacturing processes used in China" and so allow one to "readily identif[y]" Chinese pencils. Compl. 8. Those characteristics include apex-to-apex bonding (a distinctive method of joining a pencil's halves), substandard wood, off-center leads, low-quality erasers, inferior paint, unmatchable price, and loose ferrules—a reference to the small metal band that fastens the eraser to the pencil shaft. The ITC reports also identify several of these features as characteristic of Chinese pencils. For example, the reports note that U.S. pencil producers had informed the ITC that "Chinese pencils use lower quality wood, did not sharpen or erase well, had loose ferrules and erasers, and had leads that would break easily." Certain Cased Pencils from Thailand, USITC Pub. 2816, Inv. No. 731-TA-670, at II-49 (Oct. 1994) (Final). They also report that Chinese pencils have an inferior "finish, paint covering, centering of lead, and attachment of ferrule and eraser." *Id.* at II-54.

To be sure, as Relator points out, the complaint catalogues characteristics of Chinese pencils that are unmentioned in the ITC reports, including the pencils' price and bonding method, and generally describes their features in greater detail. Yet our inquiry focuses not on the additional incriminating information a relator supplies, but instead on whether "the quantum of information already in the public sphere" was sufficient to "set government investigators on the trail of fraud." *Springfield Terminal*, 14 F.3d at 654-55. In this case, answering that question is easy. Relator himself asserted not only that Chinese

pencils "can be readily identified by their overall appearance," Compl. 8, but also that defendants' pencils have "certain well known *unique* features common to pencils manufactured in China, and *distinct* from pencils manufactured elsewhere," Pl.'s Opp'n to Staples's Mot. to Dismiss 14 (emphases added). He stated, moreover, that these features "include *any one* of the following: apex-to-apex bonding[,] leads that are off center[,] and general inferior finishing." *Id.* (emphasis added). As noted above, two of these three "unique" characteristics—off-center leads and inferior finishing—were disclosed in the ITC reports. *See* USITC Pub. 2816, at II-54.

Relator tells us that he included allegations about the pencils' appearance only to prove that defendants had notice of their products' Chinese origin, not to show that the pencils *actually were* made in China. Appellant's Br. 11-12; *see also* 31 U.S.C. § 3729(a)(1)(G) (penalizing "any person who *knowingly* makes . . . a false record or statement" to avoid payments owed to the Government) (emphasis added). But his subjective intent is beside the point. As the district court explained, if the pencils' distinctive features "put defendants on notice of their Chinese origin 'without the need for direct contact with the factories actually producing the pencils,'" as Relator alleged in his complaint, "these characteristics were also sufficient to 'enable the government adequately to investigate the case and to make a decision whether to prosecute.'" *Staples*, 932 F. Supp. 2d at 41 (quoting *Springfield Terminal*, 14 F.3d at 654).

Of course, we recognize that lopsided leads may not in fact distinguish Chinese pencils from those made everywhere else in the world. But Relator alleged that this feature, in addition to others disclosed in the ITC reports, is unique to Chinese pencils, and "the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a*

*Better Environment*, 523 U.S. 83, 104 (1998). Instead of pleading facts that establish federal jurisdiction, Relator has thus pled himself out of court. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000) ("[I]t is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible.").

In any event, the ITC reports disclose more than just the physical features of Chinese pencils. They also explain that U.S. pencil makers identified three of the four defendants—Staples, Target, and OfficeMax—as "possible" importers of Chinese pencils. Cased Pencils from China, USITC Pub. 3820, Inv. No. 731-TA-669, at I-7, I-11 (Nov. 2005) (Second Review). Combined with defendants' declarations in the PIERS database that their pencils were made only in, say, Indonesia or Hong Kong, that information could likewise "have alerted law-enforcement authorities to the likelihood of wrongdoing." *Springfield Terminal*, 14 F.3d at 654 (citation omitted).

In short, Relator's suit is "based upon" publicly disclosed "allegations or transactions," thus triggering the public disclosure bar. 31 U.S.C. § 3730(e)(4)(A). Relator's arguments to the contrary are unpersuasive.

First, Relator maintains that his private investigation of defendants' foreign suppliers contributed critical independent information, without which no allegation of fraud was possible. Indeed, he asserts, even though defendants' pencils display the "Chinese characteristics described in the ITC reports," it is "still possible" that they were made elsewhere. Appellant's Br. 20. As should be clear by now, this contention flatly contradicts what Relator pled in his complaint. By his own pleadings and concessions, the material elements of the

fraud, X and Y, were already public, so Relator's private intelligence cannot defeat the FCA's jurisdictional hurdle.

Relator next argues that even if the ITC reports disclose sufficient information to unequivocally identify Chinese pencils, they nowhere reveal that *defendants*' pencils were made in China since that determination requires physical inspection of defendants' product. But this theory not only ignores the ITC reports' revelation that the principal defendants in this case might be importing Chinese pencils, it also overlooks key language in the public disclosure bar and defies its basic purpose. That provision divests courts of jurisdiction to hear *qui tam* suits that are "*based upon* the public disclosure of allegations or transactions." 31 U.S.C. § 3730(e)(4)(A) (emphasis added). And with respect to each defendant, the linchpin of Relator's allegations was that "[*b*]*ased on* their physical characteristics"—characteristics described in public reports—"these pencils were produced in China." Compl. 13, 22-24. Under Relator's theory, however, anyone armed with the information in the ITC reports could troll the aisles of any office-supply store for pencils with loose ferrules or off-center leads. The would-be plaintiff could then determine whether the retailer had paid the required antidumping duties by reference to other public information, and if it had not, then voilà, the plaintiff would be entitled to millions of dollars in *qui tam* compensation. But these sorts of lawsuits, brought by "opportunistic plaintiffs who have no significant information to contribute of their own," are precisely the kind the public disclosure bar seeks to prevent. *Springfield Terminal*, 14 F.3d at 649.

Finally, Relator contends that even if his suit rests on public disclosures, the bar does not apply because he qualifies as an original source of the information. *See* 31 U.S.C. § 3730(e)(4)(A). But because Relator declined to raise this

argument in the district court—apparently due to a "firm conviction" that his allegations did not reflect public information, Appellant's Br. 32—he has forfeited it. As we have explained, a relator may not wait until his case is on appeal before invoking the original-source exception to the public disclosure bar, but rather must set forth "sufficient jurisdictional facts in a timely fashion." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 920 (D.C. Cir. 1999). Thus, although a relator is free to "assert below that the jurisdictional bar [does] not apply because, in his view, the public disclosures [do] not fall under 31 U.S.C. § 3730(e)(4)(A)," he "does not have a right to recast his claim on appeal so as to avoid the consequences of that decision." *Id.*

## III.

Because Relator's claim is jurisdictionally barred, we have no reason to determine whether the complaint failed to state a viable FCA claim. We therefore affirm the district court's dismissal for lack of subject matter jurisdiction.

*So ordered.*