United States Court of Appeals
For the First Circuit

No. 93-1766

IN RE: UNITED STATES OF AMERICA,
EX REL. S. PRAWER AND COMPANY, ET AL.,
Plaintiffs, Appellants,

v.

FLEET BANK OF MAINE, ET AL.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Breyer, Chief Judge,

Torruella and Stahl, Circuit Judges.

Jeffrey Bennett with whom Melinda J. Caterine and Herbert H.

Bennett & Assoc., P.A. were on brief for appellants.

James E. Kaplan with whom Derek P. Langhauser, James E. Kaplan &

Associates, P.A. and Julianne Cloutier were on brief for appellee Amy

Bierbaum.
Thomas N. O'Connor with whom Donald L. Cabell and Hale and Dorr

were on brief for appellees Verrill & Dana, P. Benjamin Zuckerman and
Anne M. Dufour.
Joseph F. Shea with whom Paul R. Gupta and Nutter, McClennen &

Fish were on brief for appellee RECOLL Management Corporation.

John J. Wall, III with whom Thomas F. Monaghan and Monaghan,

Leahy, Hochadel & Libby were on brief for appellee Fleet Bank of

Maine.
Frank W. Hunger, Assistant Attorney General, Jay P. McCloskey,

United States Attorney, and Douglas N. Letter and Jonathan R. Siegel,

Attorneys, Civil Division, Department of Justice, on brief for the
United States, amicus curiae.

May 5, 1994

STAHL, Circuit Judge. This appeal arises out of
STAHL, Circuit Judge.

the district court's sua sponte dismissal of a qui tam action

brought by plaintiffs-appellants S. Prawer & Company, Gilbert

Prawer, and Harvey Prawer (collectively "Prawer") as relators

under the False Claims Act ("FCA"), 31 U.S.C. 3729 et

seq.1 Plaintiffs primarily2 contend that the court erred

in concluding that 31 U.S.C. 3730(e)(3),3 a provision

enacted as part of the 1986 amendments to the qui tam

provisions of the FCA, bars their claim. The issue is one of

first impression, as no other court has as yet been called

upon to interpret the reach and meaning of this ambiguous

1. Because of the length of the statutory provisions
relevant to this appeal, we have attached them in an appendix
to our opinion.

2. Employing an extremely literal reading of 31 U.S.C.
3730(b)(1) (an action brought under the FCA "may be dismissed
only if the court and the Attorney General give written
consent to the dismissal and their reasons for consenting"),
plaintiffs also argue that the court erred in proceeding sua

sponte and dismissing this action without the approval of the

Attorney General. Because, as will be discussed infra, we

believe the court erred in determining that this action was
jurisdictionally barred, we need not and do not address the
merits of this somewhat dubious assertion. See Fed. R. Civ.

P. 12(h)(3) ("Whenever it appears by suggestion of the
parties or otherwise that the court lacks jurisdiction of the

subject matter, the court shall dismiss the action.")

(emphasis added).

3. Section 3730(e)(3) states: "In no event may a person
bring [a qui tam action] which is based upon allegations or

transactions which are the subject of a civil suit or an
administrative money penalty proceeding in which the
government is already a party."

-2-
2

provision. After careful consideration of the arguments

presented, we reverse.

I.

BACKGROUND

A. Relevant Factual and Procedural History

The relevant facts and allegations, recounted in

the light most favorable to plaintiffs, are as follows.4 In

January 1991, the Maine National Bank ("MNB") was declared

insolvent and the Federal Deposit Insurance Corporation

("FDIC") was appointed its receiver. The New Maine National

Bank ("NMNB") was established as a bridge bank through which

the FDIC would conduct certain MNB-related affairs.

On or about July 12, 1991, the NMNB closed, and the

FDIC sold virtually all of its assets to Fleet Bank of Maine

("Fleet"). The contract by which this transfer of assets was

effectuated is known as the "Assistance Agreement." Inter

alia, the Assistance Agreement provided that Fleet had the

right to "put," or cause the FDIC to repurchase, any NMNB

loans acquired by it pursuant to the Assistance Agreement

4. A few of the following facts and allegations appear only
in plaintiffs' brief. Because they help shed light on the
convoluted factual underpinnings of this litigation and have
no effect on our resolution of the question before us, we
have included them in our recitation of the case's
background. Our inclusion of these facts and allegations
should not, however, be construed either as an endorsement of
their veracity or as an indication that they are well-
pleaded.

-3-
3

(provided that said loans did not fall into any one of

several exceptional categories described in the Assistance

Agreement). Included among the transferred assets were five

promissory notes, totalling approximately $1.1 million, given

by Prawer to the NMNB. The notes represented the amount

Prawer had drawn against a $2 million line of credit extended

to it by NMNB.

On July 15, 1991, Prawer entered into a new

agreement with Fleet for an unsecured line of credit (known

as the "Fleet Credit Facility") which permitted it to draw up

to $2 million by executing and/or renewing consecutive,

unsecured 90-day term notes on a note-by-note basis. Prawer

utilized this new line of credit from Fleet to satisfy fully

its obligations under each of the five outstanding NMNB

notes. By May 5, 1992, Prawer had drawn $1.6 million against

its $2 million line of credit under the Fleet Credit

Facility. These borrowings were evidenced by seven unsecured

90-day term notes.

Meanwhile, on April 30, 1992, Prawer sold virtually

all of its then-existing assets to C&S Wholesale Grocers,

Inc. ("C&S"). Gilbert Prawer informed Fleet of the sale on

May 1, 1992. On May 6, 1992, pursuant to the Assistance

Agreement, Fleet put certain Prawer notes back to the FDIC.

-4-
4

The parties hotly contest, however, whether any of the notes

were "putable" under the terms of the Assistance Agreement.5

1. The Collection Case

Subsequently, in November 1992, the FDIC commenced

an action against Prawer, C&S, and a number of individual

defendants to collect upon the notes put back to it pursuant

to the Assistance Agreement. The complaint in that action

not only sought enforcement of the notes, but also alleged

that the April 30, 1992, sale of Prawer's assets to C&S

constituted a fraudulent conveyance and violated Maine's Bulk

Sale Act. More specifically, the FDIC contended that Prawer

had become insolvent, and had peddled its assets for less

than full value in order to satisfy its debts to certain

creditors. Accordingly, the complaint sought damages beyond

the amount allegedly outstanding on the notes.

Prawer responded to this complaint with several

affirmative defenses and counterclaims, as well as filing a

third-party complaint against Fleet and Recoll Management

Corporation ("Recoll"), a Fleet subsidiary which had,

pursuant to an agreement with the FDIC, been seeking to

5. It has been and is plaintiffs' position that none of the

notes were properly putable; defendants apparently now
concede that some of the notes were not putable because

plaintiffs' obligations thereunder had been fully satisfied,
but argue that certain other notes were, in fact, putable.

-5-
5

collect upon the notes which were put back to the FDIC. A

variety of charges were made in these defenses,

counterclaims, and third-party claims; among these was an

assertion that the notes were not putable to the FDIC

pursuant to the Assistance Agreement. But see infra note 6.

At oral argument, the parties represented that,

since the filing ofthis case, the Collection casehas settled.

2. The Qui Tam Case

On June 21, 1993, plaintiffs filed the instant qui

tam action. In their complaint, plaintiffs contended that

the named defendants -- Fleet, Recoll, Verrill & Dana (the

law firm that served as legal counsel to Fleet, Recoll, and

the FDIC at all times relevant to this matter), P. Benjamin

Zuckerman and Anne M. Dufour (the Verrill & Dana lawyers

involved in this matter), and Amy Bierbaum (an FDIC staff

attorney) -- "created and used, or caused to be created and

used, false records and statements designed to defraud the

Government into paying Fleet approximately $1.6 million" for

the Prawer notes pursuant to the put-back provisions of the

Assistance Agreement.

Nine days later, on June 30, 1993, the district

court sua sponte dismissed plaintiffs' complaint. In so

doing, the court relied upon 3730(e)(3), see supra note 3,

finding that (1) the allegations made and transactions

implicated in plaintiffs' complaint already were at issue (as

-6-
6

defenses) in the Collection case; and (2) the "government,"

in the person of the FDIC, was a party to that action. See

United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine,

825 F. Supp. 339 (D. Me. 1993).

Plaintiffs moved the court to reconsider its sua

sponte order of dismissal, arguing, inter alia, that (1) the

"government," for purposes of 3730(e)(3), was not a party

to the Collection case; and (2) the qui tam action was not

"based upon allegations or transactions which are the subject

of" the Collection case. In a comprehensive memorandum of

decision, the court rejected both of these arguments (as well

as all other arguments made in plaintiffs' motion). In so

doing, however, the court receded slightly from its original

holding on the question of whether there was an identity

between the allegations and transactions which were "the

subject of" the Collection case and those that served as the

basis for the qui tam action. Instead, the court found:

To the extent that defenses based
upon the allegations of the qui tam

complaint are not pleaded in the related
civil action, that is entirely the result
of the conscious decision of counsel for
the defendants there (and Plaintiffs
here) to abjure their pleading. Clearly
the factual predicate for the false
claims alleged in the qui tam action form

the basis for assertion of viable
defenses to the claims made against the
defendant S. Prawer & Company on the
notes in the related civil action. An
effective defense to those claims would
require that those defenses be pleaded
there if counsel, in good faith, believe

-7-
7

the facts put forth here. . . . This
Court believes that the proper
construction of [ 3730(e)(3)] requires
that it be read broadly enough to
encompass not only allegations and
transactions actually put in issue by the
litigants in the related civil suit but
any allegations or transactions that
could legitimately be made a subject
(e.g., [sic] be put in issue) of that

suit in the regular course of its
development.

United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine,

Civ. No. 93-165-P-C, slip op. at 3-4 (D. Me. July 12, 1993)

(footnote omitted).6 Accordingly, the court denied

plaintiffs' motion. Id. at 9.

B. The Statutory Framework

Because our resolution of the issue presented in

this appeal necessarily is informed by Congress's intent in

enacting the 1986 amendments to the FCA's qui tam provisions,

a brief historical overview of the statute is in order. The

FCA's qui tam7 provisions, see generally 31 U.S.C.

6. Our review of the pleadings in the Collection case
reveals that it is a close question as to whether the
illegitimacy of the put (on grounds of fraud) actually was
raised therein as an affirmative defense. However, because

we find that 3730(e)(3) does not bar this action even if
the fraud claim was so raised, we will assume this fact
arguendo and will not address the district court's ruling

that the statute also bars qui tam actions based upon

allegations or transactions that could have been raised in

another civil action or administrative money penalty
proceeding.

7. "Qui tam" is an abbreviation for "qui tam pro domino rege

quam pro seipso," which literally means "he who as much for

the king as for himself." United States ex rel. Springfield

Terminal Ry. Co. v. Quinn, 14 F.3d 645, 647 n.1 (D.C. Cir.

-8-
8

3730(b)-(g), empower private persons, known as "relators,"

(1) to sue, on behalf of the government, persons who

knowingly have presented the government with false or

fraudulent claims (as the highlighted terms are defined by 31

U.S.C. 3729); and (2) to share in any proceeds ultimately

recovered as a result of such suits, see generally 31 U.S.C.

3730(d). Since its enactment in 1863,8 the FCA has

contained several different qui tam provisions. The original

provisions contained no significant jurisdictional

limitations and did not preclude plaintiffs from bringing

suit on the basis of information already in the government's

possession. Quinn, 14 F.3d at 649. Despite this invitation

for abuse, however, the provisions were used sparingly in the

first fifty years of their existence. Id. (citing United

States ex rel. LaValley v. First Nat'l Bank of Boston, 707 F.

Supp. 1351, 1354 (D. Mass. 1988)).

During the New Deal and World War II, there was a

notable increase in the number of contracts awarded by the

1994) (citing John T. Boese, Civil False Claims and Qui Tam

Actions, 1-6 (1993)). Qui tam provisions, which historically

have allowed parties to initiate suit on the government's
behalf and to share in the recovery as bounty, first gained
popularity in thirteenth-century England as a supplement to
ineffective law enforcement. Id. (citing Note, The History

and Development of Qui Tam, 1972 Wash. U. L.Q. 81, 86-87 and

Boese, supra, at 1-6).

8. The FCA originally was enacted "in order to combat
rampant fraud in Civil War defense contracts." See S. Rep.

No. 345, 99th Cong., 2d Sess. 8, reprinted in 1986

U.S.C.C.A.N. 5266, 5273.

-9-
9

government to private individuals and entities. Id. Along

with this increase came a concomitant surge in the number of

qui tam actions brought by relators under the FCA. See id.

This litigational surge, in turn, brought to the fore the

fact that the qui tam provisions then in effect were too

susceptible to abuse by "parasitic" relators. The era of

parasitic qui tam actions reached its apex in United States

ex rel. Marcus v. Hess, 317 U.S. 537 (1943), where the

Supreme Court allowed a relator to proceed with a qui tam

suit that was based solely on the allegations of a criminal

indictment to which defendants already had pleaded nolo

contendere (and as a result of which defendants already had

paid fines totalling $54,000). See Quinn, 14 F.3d at 649-50;

see also S. Rep. No. 562, 99th Cong., 2d Sess. 10, reprinted

in 1986 U.S.C.C.A.N. at 5275. In rejecting the government's

argument that permitting the action to proceed would thwart

the spirit of the FCA, the Court stated:

Even if . . . petitioner has
contributed nothing to the discovery of
this crime, he has contributed much to
accomplishing one of the purposes for
which the [FCA] was passed. The suit
results in a net recovery to the
government of $150,000, three times as
much as fines imposed in the criminal
proceedings.

Hess, 317 U.S. at 545. Accordingly, because the Court found

neither a bar to the suit in the text of the FCA nor an

intent to impose one in the Act's legislative history, id. at

-10-
10

546, it declined to establish a judicial bar on its own

initiative, Quinn, 14 F.3d at 650.

In response to public outcry over the Hess

decision, Congress acted quickly to restrict the universe of

litigants who could avail themselves of the FCA's qui tam

provisions. Id. at 650. The 1943 amendments to these

provisions, signed into law by President Roosevelt on

December 21, 1943, codified this restriction. See S. Rep.

No. 562, 99th Cong., 2d Sess. 12, reprinted in 1986

U.S.C.C.A.N. at 5277. The amendments reflected compromise

between the House and Senate; the House bill would have

repealed the qui tam provisions altogether, while the Senate

bill would have precluded suits which were based upon

information already in the government's possession unless the

information underlying the suit was "original with [the]

person [bringing the suit]." Quinn, 14 F.3d at 650 (quoting

89 Cong. Rec. 510, 744 (daily ed. December 16, 1943)); see

also S. Rep. No. 562, 99th Cong., 2d Sess. 11-12, reprinted

in 1986 U.S.C.C.A.N. at 5276-77. Although the Senate's

approach largely prevailed, the provision of the Senate bill

expressly permitting the "original source" of information to

bring a qui tam action was dropped in conference. See S.

Rep. No. 562, 99th Cong., 2d Sess. 12, reprinted in 1986

U.S.C.C.A.N. at 5277. As a result, the final 1943

legislation precluded all qui tam actions "based on evidence

-11-
11

or information the Government had when the action was

brought." 31 U.S.C. 3730(b)(4) (1982) (superseded); see

also Quinn, 14 F.3d at 650.

Over the next four decades, courts strictly

construed the jurisdictional bar established in the 1943

amendments. See S. Rep. No. 562, 99th Cong., 2d Sess. 12,

reprinted in 1986 U.S.C.C.A.N. at 5277. Unsurprisingly,

there was a corresponding decrease in the use of the qui tam

provisions to enforce the FCA during this same period.

Quinn, 14 F.3d at 650 (citing Boese, supra note 7, at 1-12).

If the Hess decision marks the highpoint of the regime of

liberal litigation under the qui tam provisions, the Seventh

Circuit's decision in United States, ex rel. State of

Wisconsin v. Dean, 729 F.2d 1100 (7th Cir. 1984), may well

mark the point of greatest retreat from Hess. See Quinn, 14

F. 3d at 650.

In Dean, the Seventh Circuit was faced with the

question of whether the State of Wisconsin should be allowed

to act as a qui tam relator in a Medicaid fraud action where

the State, in accordance with federal regulations, had

already reported the fraud to the federal government. See

Dean, 729 F.2d at 1102-04. It was undisputed that (1) the

fraud investigation had been conducted by the State; (2) the

State was an original source of the information provided; and

(3) the State had been required to report the fraud. See id.

-12-
12

at 1102-03 and n.2. Nonetheless, noting the unambiguous

language of the FCA, the disappearance of the original source

provision from the 1943 Senate bill, and the absence of any

basis for finding an exception to the statutory bar where the

relator was required to report the information, the court

rejected the contentions of both the State and the federal

government, which had filed an amicus brief on behalf of the

State, that the FCA's legislative history evinced a "`clearly

expressed legislative intention'" to allow the action to go

forward. See id. at 1104-05 (quoting Consumer Product Safety

Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).

Accordingly, it reversed the decision of the district court,

which had found such an intention. See id. at 1104-06.

In the wake of the Seventh Circuit's opinion in

Dean, there was once again a perception that the qui tam

provisions were in need of alteration. See S. Rep. No. 562,

99th Cong., 2d Sess. 13, reprinted in 1986 U.S.C.C.A.N. at

5278 (recounting that the National Association of Attorneys

General adopted a resolution calling on Congress to rectify

"the unfortunate result" of the Dean decision). Ultimately,

Congress responded with the False Claims Amendments Act of

1986, the stated purpose of which was "`to enhance the

Government's ability to recover losses sustained as a result

of fraud against the Government.'" Quinn, 14 F.3d at 650

(quoting S. Rep. No. 562, 99th Cong., 2d Sess. 1, reprinted

-13-
13

in 1986 U.S.C.C.A.N. at 5266). Concerned that sophisticated

and widespread fraud was depleting the national fisc, the

drafters of the 1986 amendments concluded that "`only a

coordinated effort of both the Government and the citizenry

will decrease this wave of defrauding public funds.

Accordingly, the Senate bill increases incentives, financial

and otherwise, for private individuals to bring suits on

behalf of the Government.'" Id. at 650-51 (quoting S. Rep.

No. 562, 99th Cong., 2d Sess. 1-2, reprinted in 1986

U.S.C.C.A.N. at 5266-67).

The 1986 amendments changed the FCA's qui tam

provisions in several respects. On the one hand, they

contained several provisions designed to "encourage more

private enforcement suits." See id. at 651 (quoting S. Rep.

No. 562, 99th Cong., 2d Sess. 23-24, reprinted in 1986

U.S.C.C.A.N. at 5288-89). Among these are the original

source provision eliminated from the 1943 Senate bill, a

provision increasing monetary awards, a lower burden of

proof, and a provision allowing qui tam plaintiffs to

continue to participate in the actions after intervention by

the government. Id. (citing United States ex rel. Stinson,

Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944

F.2d 1149, 1154 (3d. Cir. 1991)). On the other hand,

Congress also enacted new provisions designed, inter alia, to

continue the prohibition against strictly parasitic lawsuits.

-14-
14

See generally 31 U.S.C. 3730(e); see also Quinn, 14 F.3d at

651.

We think Judge Wald summarized rather well the

objectives of the 1986 amendments:

The history of the FCA qui tam

provisions demonstrates repeated
congressional efforts to walk a fine line
between encouraging whistle-blowing and
discouraging opportunistic behavior. The
1986 amendments inevitably reflect the
long process of trial and error that
engendered them. They must be analyzed
in the context of these twin goals of
rejecting suits which the government is
capable of pursuing itself, while
promoting those which the government is
not equipped to bring on its own.

Id.

-15-
15

II.

DISCUSSION

A. The Jurisdictional Question

As they did before the district court, plaintiffs

here argue that (1) the FDIC is not, for purposes of

3730(e)(3), "the government"; and (2) the instant action is

not "based upon allegations or transactions which are the

subject of" the Collection case. See supra note 3. Because

we believe that the second of these two contentions is

ultimately persuasive, and that the statutory bar of

3730(e)(3) therefore does not apply, we turn our sights to

this provision of the statute.

We start by noting the obvious: the breadth with

which we should read the phrase "allegations or transactions

which are the subject of a civil suit" is not readily

apparent from the text of the statute. Defendants' argument

that, because plaintiffs denied the legitimacy of the put

transaction (alleging fraud) in the Collection case, there is

an identity between the allegations and transactions which

were at least a "subject of" that case and the fraud

allegations which serve as "the basis" of this case certainly

strikes us as being anchored upon a plausible construction of

the phrase "the subject of" in 3730(e)(3). So too,

however, does plaintiffs' argument that, when viewed at an

appropriate level of specificity, the transactions and

-16-
16

allegations which are "the subject of" the Collection case

should and must be seen only as Prawer's (1) making of the

sued-upon notes, and (2) alleged failure to satisfy them.

Therefore, we regard the statute as ambiguous.

When faced with a facially ambiguous statutory

provision, we look to the statute as a whole and the history

of its enactment in order to glean congressional intent.

See, e.g., Concrete Pipe & Prods., Inc. v. Construction

Laborers Pension Trust, 113 S. Ct. 2264, 2281 (1993); Gaskell

v. Harvard Coop. Soc'y, 3 F.3d 495, 499 (1st Cir. 1993);

United States v. Alky Enters., Inc., 969 F.2d 1309, 1314 (1st

Cir. 1992). Here, we think the rather easily-discerned

purposes underlying the 1986 amendments militate strongly in

favor of plaintiffs' reading of the phrase.

As Judge Wald observed in the Quinn decision (and

as we have noted above, see supra at 14-15), "[t]he history

of the FCA qui tam provisions demonstrates repeated

congressional efforts to walk a fine line between encouraging

whistle-blowing and discouraging opportunistic behavior,"

Quinn, 14 F.3d at 651. Clearly, the 1986 amendments, insofar

as they were responding to a regime in which the preclusion

of opportunistic litigation was too heavily weighted, had as

perhaps their central purpose an expansion of opportunities

and incentives for private citizens with knowledge of fraud

against the government to come forward with that information.

-17-
17

See S. Rep. No. 562, 99th Cong., 2d Sess. 1, reprinted in

1986 U.S.C.C.A.N. at 5266 ("The purpose of [the 1986

amendments] is to enhance the Government's ability to recover

losses sustained as a result of fraud against the

Government."); id. at 1-2, reprinted in 1986 U.S.C.C.A.N. at

5266-67 ("The proposed legislation seeks not only to provide

the Government's law enforcers with more effective tools, but

to encourage any individual knowing of Government fraud to

bring that information forward."); id. at 2, reprinted in

1986 U.S.C.C.A.N. at 5267 ("[The 1986 amendments] increase[]

incentives, financial and otherwise, for private individuals

to bring suits on behalf of the Government."). Indeed, it is

apparent that a primary objective of the 1986 amendments, as

revealed in the above-quoted Senate Report and in published

hearings on the proposed legislation, was to encourage and

provide incentives for the bringing of qui tam actions in all

but the several circumstances delineated in 3730(e). See

generally id. at 1-17, reprinted in 1986 U.S.C.C.A.N. at

5266-82; see also generally False Claims Reform Act: Hearing

Before the Subcomm. on Admin. Practice and Proc. of the

Senate Comm. on the Judiciary, 99th Cong., 1st Sess. (Sept.

17, 1985); False Claims Act Amendments: Hearings Before the

Subcomm. on Admin. Law and Governmental Relations of the

Comm. on the Judiciary House of Representatives, 99th Cong.,

2d Sess. (February 5 and 6, 1986).

-18-
18

Obviously, then, the question becomes: What

circumstances does 3730(e)(3) seek to avoid? It seems

clear that the answer to this question is circumstances

involving "parasitic" qui tam actions which are not otherwise

barred by 3730(e). Cf., e.g., Quinn, 14 F.3d at 651

(interpreting the 1986 amendments as "still another

congressional effort to reconcile avoidance of parasitism and

encouragement of legitimate citizen enforcement actions").

Thus, when it is not clear whether or not a qui tam action

should be barred by the ambiguous provision precluding the

action if it is "based upon transactions or allegations which

are the subject of" another suit or proceeding in which the

government is a party, we think that a court should look

first to whether the two cases can properly be viewed as

having the qualities of a host/parasite relationship. In

answering this question, we think it would be useful for the

court to be guided by the definition of the word "parasite,"

and ask whether the qui tam case is receiving "support,

advantage, or the like" from the "host" case (in which the

government is a party) "without giving any useful or proper

return" to the government (or at least having the potential

to do so). See Random House Dictionary of the English

Language 1409 (2d ed. unabridged 1987). If this question is

answered in the affirmative, the court may properly conclude

that there is an identity between "the basis" of the qui tam

-19-
19

action and "the subject of" the other suit or proceeding; if

this question is answered in the negative, the court

similarly may gather that such an identity is lacking.

Of course, because Congress's intuition as to what

constitutes "potential useful and proper return" to the

government clearly changed with the enactment of the 1986

amendments, our endorsement of this inquiry would beg the

question entirely without two further points. While the

question of what now constitutes potential useful or proper

return to the government will not always be easily answered

and must necessarily be addressed on a case-by-case basis, we

believe it important to note that one of the most important

perceptions precipitating the 1986 amendments was that

actions which had the potential of providing such return were

being precluded by the then-existing statutory regime. In

light of this, we feel courts should proceed with caution

before applying the statutory bar of 3730(e)(3) in

ambiguous circumstances.

On the other hand, we think it clear that a qui tam

suit's potential for adding funds to the government's

coffers, without more, should not be regarded as constituting

useful or proper return to the government. In enacting the

1943 amendments to the FCA's qui tam provisions, Congress

clearly rejected the view (espoused in Hess, 317 U.S. at 545)

that this potentiality alone was sufficient to render non-

-20-
20

parasitic (and therefore viable) a qui tam action which is

completely derivative of another case in which the government

is a party. And, while the 1986 amendments certainly reveal

an intent to recharacterize as "non-parasitic" actions which

would have been considered "parasitic" under the 1943-1986

regime (which regarded as "parasitic" all qui tam actions

based upon evidence or information the government had when

the action was brought), nothing in these amendments suggests

a congressional desire to return to the 1863-1943, pre-Hess

regime.

Turning to the instant appeal, we think that two

facts combine to compel the conclusion that this case has the

potential of providing "useful or proper return" to the

government, and therefore is not "parasitic" of the

Collection case. First, the FDIC (which we shall assume

arguendo to be "the government" within the meaning of

3730(e)(3)) was not proceeding against the defendants to this

action, for fraud or otherwise, in the Collection case.9

Therefore, because this case is seeking to remedy fraud that

the government has not yet attempted to remedy, it is, as a

threshold matter, wholly unlike the one the drafters of

3730(e)(3) almost certainly had in mind and sought to

9. Of the defendants named here, only Fleet and Recoll were
parties to the Collection case. Moreover, Fleet and Recoll
were only parties to that case because Prawer had filed a

series of third-party claims against them.

-21-
21

preclude (i.e., a qui tam action based upon allegations or

transactions pleaded by the government in an attempt to

recover for fraud committed against it).

Second, it does not appear that the FDIC could have

sued Fleet for fraud as part of the Collection case as that

case was constituted. Had it attempted to do so, the FDIC

not only would have been asserting, as a plaintiff, both the

validity and the invalidity of the sued-upon notes against

separate defendants in the same lawsuit, but it also

seemingly would have been claiming under an entirely

different "transaction or occurrence" (i.e., the put-back of

the notes pursuant to the Assistance Agreement) than the one

(Prawer's making of the notes and alleged failure to satisfy

them) which was the subject matter of the Collection case.

This scenario is not, of course, allowed under the Federal

Rules of Civil Procedure. See Fed. R. Civ. P. 14(a) ("The

plaintiff may assert any claim against the third-party

defendant arising out of the transaction or occurrence that

is the subject matter of the plaintiff's claim against the

third-party plaintiff . . . .") (emphasis supplied); see also

C. Wright, A. Miller, and M. Kane, Federal Practice and

Procedure, 1459 at 449 n.4 (1990) ("Plaintiff cannot in

effect substitute, as against the third-party defendant,

another cause of action for that originally commenced by

-22-
22

him.") (citing Welder v. Washington Temperance Ass'n, 16

F.R.D. 18, 20 (D. Minn. 1954)).

Another way to look at this question is to

determine whether defendants' construction of this ambiguous

statutory provision would further the purposes underlying the

1986 amendments. At oral argument, when pressed on this

point, defendants' attorneys acknowledged that their position

necessarily was predicated upon the view that qui tam actions

were to be avoided once the government had notice of the

transactions or allegations giving rise to the actions.10

However, such a view must be rejected for two reasons: (1)

Congress has explicitly deemed a "notice" regime insufficient

to protect the government against false claims (indeed, it

was precisely such a regime that Congress sought to abandon

in enacting the 1986 amendments); and (2) Congress, when it

wants to establish a notice regime, knows how to do so in far

less ambiguous terms than those utilized in 3730(e)(3), see

31 U.S.C. 3730(e)(2)(A) (precluding qui tam actions brought

against members of Congress, members of the judiciary, or

senior executive branch officials "if the action is based

upon evidence or information known to the Government when the

action was brought"); 31 U.S.C. 3730(b)(4) (1982)

10. After all, given the facts noted in the preceding two
paragraphs, the most defendants here can argue is that the
government was, in the Collection case, provided with notice
of the allegedly fraudulent nature of put-back transaction.

-23-
23

(superseded) (precluding all qui tam actions "based on

evidence or information the Government had when the action

was brought").

To sum up, the instant qui tam action has the

potential for providing "useful or proper return" to the

government in at least two significant ways: (1) it seeks

recovery from alleged defrauders of the government for fraud

that has not yet been the subject of a claim by the

government; and (2) it has the potential to restore money to

the public fisc that would not and could not have been

restored in the Collection case. As such, we do not think

that it can be characterized as "parasitic." Therefore, we

believe that it would undermine the purposes of the 1986

amendments to construe this action as being "based upon

allegations or transactions which are the subject of" the

Collection case.

B. Other Matters

We recognize that defendants have made several

alternative arguments for affirmance in their respective

briefs. We also recognize that plaintiffs have moved to

dismiss Fleet and Recoll from this action. Given the nascent

state of this litigation (and all that this implies --

including an undeveloped record, an inadequate period of time

for plaintiffs to have cured any defects in their pleadings,

and the lack of a full opportunity for the government to have

-24-
24

reviewed the pleadings, see 31 U.S.C. 3730(b)), however, we

decline either to delve into defendants' other arguments or

to grant plaintiffs' motion to dismiss at this time.

Instead, we leave these matters for the district court to

decide after the government determines whether or not it will

intervene. So too do we leave to the district court all

requests for costs arising out of claims that this action is

frivolous and has been undertaken in bad faith. To the

extent that any such request may be predicated on an argument

that this appeal was frivolous, it is rejected.

III.

CONCLUSION

For the reasons explained above, we do not think

that the instant qui tam action "is based upon allegations or

transactions which are the subject of" the Collection case.

Accordingly, the district court erred in dismissing sua

sponte plaintiffs' complaint on the basis of 31 U.S.C.

3730(e)(3). The judgment of the district court therefore is

vacated.

Vacated and remanded. No costs.

-25-
25