UNITED STATES of America ex rel.,
ERVIN AND ASSOCIATES,
INC., Plaintiff,

v.

The HAMILTON SECURITIES
GROUP, INC., et al.,
Defendants.

Nos. CIV.A.96–CV1258(LFO),
CIV.A.99–CV1698(LFO).

United States District Court,
District of Columbia.

May 1, 2003.

**2**

Aaron L. Handleman, Eccleston & Wolf, Joseph P. Hornyak, Sonnenschein Nath & Rosenthal, Michael Philip Freije, Eccleston & Wolf, Renee Catherine Macri, Sonnenschein Nath & Rosenthal, Washington, DC, for Plaintiff.

Brian Arthur Coleman, Kenneth E. Ryan, Michael J. McManus, Drinker, Biddle & Reath, LLP, Washington, DC, for Defendants.

### MEMORANDUM

OBERDORFER, District Judge.

Pending is Hamilton Securities Group, Inc.'s second motion to dismiss Ervin and Associates, Inc.'s claims relating to optimization errors. For the reasons set forth below, an accompanying order denies the motion.

### I.

A. *General Factual and Procedural History*

This motion relates to the first in a trio of cases arising from a series of mortgage auctions run by the U.S. Department of Housing and Urban Development ("HUD"). In 1994, HUD contracted with Hamilton Securities Group, Inc. ("Hamilton") to design, structure, and conduct a series of competitive, sealed-bid auctions in the private sector to dispose of a large inventory of mortgages. Ervin and Associates, Inc. ("Ervin") filed a *qui tam* complaint in this Court in June 1996, alleging that Hamilton and other defendants conspired to defraud the government in the course of the HUD mortgage auctions in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the Act"). *See United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Group, Inc.,* No. 96–1258(LFO). The government elected not to intervene. Hamilton subsequently filed a lawsuit against Ervin, alleging tortious interference with contractual relations and prospective business advantage. *See Hamilton Secs. Group, Inc. v. Ervin & Assocs., Inc.,* No. 99–1698(LFO).

In March 1998, Hamilton filed suit against HUD in the Court of Federal Claims, after HUD terminated their contract upon learning of errors in the design and operation of a computer model used to determine winning bids in the mortgage auctions, which yielded lower proceeds than would have otherwise been generated.[1] In August 1999, the United States filed an amended counterclaim against Hamilton in the Court of Federal Claims alleging breach of contract, or alternatively, negligence or negligent misrepresentation. *See* United States First Amended Counterclaim, *Hamilton Securities Advisory Servs., Inc. v. United States,* No. 98–169. In September 1999, Ervin amended

---

1. The terms "model" and "computer model," as used in this Memorandum, refer to the computer program used by Hamilton to determine the winning bids in the HUD mortgage auctions. The term "optimization error(s)" refers to flaws in the computer model which allegedly led to diminished yields from the auctions.

its *qui tam* action against Hamilton to include allegations concerning the errors in the computer model.

On May 15, 2001, Ervin filed an action against the United States, in essence alleging that the Court of Federal Claims counterclaim was an attempt to bypass the provisions of the False Claims Act entitling Ervin to some financial rewards. *See Ervin & Associates, Inc. v. United States,* No. 01–1052(LFO). Ervin's complaint sought: 1) a declaration, pursuant to the Declaratory Judgment Act, that the counterclaim filed by the United States against Hamilton in the Court of Federal Claims is an "alternate remedy" under the False Claims Act, to which Ervin is entitled a share; and 2) a stay of the Court of Federal Claims action in order to avoid possible res judicata and/or collateral estoppel effects that may interfere with Ervin's *qui tam* action in this Court.

The United States filed a motion to dismiss the case brought against it by Ervin, and a hearing on the motion was held in April 2002. A ruling on that motion was withheld because it raised an issue that could partially dispose of the initial *qui tam* action filed by Ervin (No. 96–1258). Specifically, the United States argued, *inter alia,* that this Court lacked jurisdiction over Ervin's *qui tam* claims that related to the computer model Hamilton used to run the auction. Since the proper party to raise this argument is Hamilton, this Court issued an order seeking Hamilton's views on whether this Court had jurisdiction over the claims related to the computer model. Hamilton responded with the present motion to dismiss.

B. *Specific Facts Relating to the Computer Model Claims*

Ervin filed its original complaint in the present *qui tam* case on June 6, 1996. In this original complaint, Ervin alleged a conspiracy involving Hamilton, Goldman Sachs & Co., and BlackRock Capital Finance, L.P. Ervin alleged several acts that Hamilton took in furtherance of the conspiracy, including "Hamilton's misapplication of a defective 'optimization model' to limit competition." Orig. Compl. at ¶ 13. Ervin alleged that the computer model contained "major flaws ... that people have used to gain an unfair advantage." *Id.* at ¶ 80. According to Ervin, the model allegedly gave bidders with deeper pockets an advantage over smaller bidders. Ervin also alleged that the model was not structured to retain some of the loans (for reselling at a later date), even though such retention might be more advantageous to HUD. *Id.* at ¶¶ 79–85.

Furthermore, Ervin contended that the defective model was purposely misused, alleging that "HUD and its advisors ... have implemented a public relations disinformation campaign designed to convince smaller bidders that they actually have a chance to be successful." *Id.* at ¶ 84. Ervin added, "considering the nature of the optimization model, stating that small players have a chance to win is an outright lie and is calculated to cloak the note sales process in the cloth of fairness when, in fact, it is not." *Id.* at ¶ 85.

Ervin's June 1996 complaint did not mention any specific mortgage note sales, including the "West of Mississippi" ("WOM") sale, which had been conducted on September 19, 1995. Approximately a month after Ervin filed its original *qui tam* complaint, HUD and Hamilton conducted another note sale, the "North/Central" ("N/C") sale.

Hamilton alerted certain individuals at HUD to computer modeling imperfections via two memoranda, dated December 4 and 20, 1996 ("the December memoranda"). The December 4, 1996, memo stated that Hamilton had discovered the errors

on October 24, 1996, and explained that an analysis was ongoing. The December 20, 1996 memo provided further details on what had transpired.[2] By September 1997, an internal investigation was underway at HUD. On October 17, 1997, HUD formally terminated Hamilton's contract and wrote a letter demanding repayment of the alleged government loss. A few days later, on October 20 and 21, 1997, *The Wall Street Journal* and *The Washington Times* publicly reported allegations of bid-rigging.

Ervin filed an amended *qui tam* complaint on September 3, 1999. The amended complaint contained further allegations regarding the design and operation of the optimization model, as well as new counts (Counts VII and IX) based on those allegations. *See* Amended Compl. at ¶¶ 62–66, 72–79, 132, 163–170, 184–188, 243, 251. The amended complaint recited allegations regarding the WOM and N/C note sales,[3] including information that had been reported in the Brocks memorandum. *Id.* at ¶¶ 163–67. For example, Ervin alleged, consistent with the Brocks memo, that Hamilton had deliberately locked out the winning bid of "ALI pool bid # 3" so that Goldman Sachs would be awarded assets as part of the WOM sale. *Id.* According to Ervin, its allegations in the amended complaint are simply more specific averments of the allegations pled in its original complaint. Hamilton, however, contends that

Ervin's allegations in its amended complaint were all recycled from public disclosures made by others, and therefore, Ervin is not a proper relator under the Act.

## II.

A *qui tam* relator's qualification to proceed is an issue of subject matter jurisdiction. *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1003 (10th Cir.1996). Hamilton moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), which requires that the plaintiff bear the burden of establishing by a preponderance of the evidence that the court has jurisdiction to entertain his claims. Fed.R.Civ.P. 12(b)(1); *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001) (holding that the court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.").

While the Court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *Leatherman, et al. v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), because the plaintiff has the burden of proof to establish jurisdiction, the " 'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in

---

2. Ervin eventually uncovered through discovery a memorandum, dated September 28, 1995, from Michael Brocks of Coopers and Lybrand, an accounting firm that had been retained to monitor bid protocols. In the fax, Brocks informed Henry Fay at Hamilton that one of the bidders in the WOM sale, the "ALI pool bid # 3," actually exceeded by $2.5 million the bids of all other bidders whom Hamilton had declared as winners. Hamilton did not mention this fax in its December memoranda to HUD. As mentioned above, the December 4 memorandum stated that Hamilton had learned about problems with the comput-

er model in October 1996—this, despite Fay's receipt of the Brocks fax over a year earlier. Ervin turned over the fax to the Department of Justice and to HUD's Office of Inspector General on June 23, 1998.

3. Although Ervin's amended complaint alleged impropriety involving the North/Central sale, *see* Amended Compl. at ¶ 186, Hamilton emphasizes that Goldman Sachs was not awarded any mortgage notes as part of that sale. *See* Hamilton's Reply in Support of its Motion to Dismiss at 6.

resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of the Fraternal Order of Police*, 185 F.Supp.2d at 13–14 (citation omitted). In deciding a Rule 12(b)(1) motion, this court is not limited to the allegations in the complaint but may consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case. *See EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997).

## III.

The central issue for this motion is whether Ervin is the "original source" of the information that supports the allegations in the amended *qui tam* complaint, or whether disclosures from other sources bar Ervin from proceeding as a *qui tam* relator.

### A. "Original Source" Defined

██ Under 31 U.S.C. § 3730(e)(4)(A), there is no jurisdiction over a *qui tam* action "based upon the public disclosure of allegations or transactions ... unless ... the person bringing the action is an original source of the information." The Act defines "original source" as

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under the section which is based on the information.

31 U.S.C. § 3730(e)(4)(B). Thus, to qualify as an "original source," Ervin must demonstrate that it had "direct" and "independent" knowledge of the fraud, and that it "voluntarily" provided information to the United States prior to filing the action. "Direct knowledge" is defined as knowledge that is "marked by the absence of intervening agency." *See United States ex*

*rel. Alexander v. Dyncorp, Inc., et al.*, 924 F.Supp. 292, 300 (D.D.C.1996) (citation omitted). "Independent" means it is not dependent on public disclosures. *Id.* These jurisdictional requirements serve to ensure that the Act's rewards are available only where, at the time the *qui tam* claims were filed, the federal government was not already "on the trail" of the alleged wrongdoing. *See United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (citing *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 655 (D.C.Cir.1994)).

### B. D.C. Circuit Law

This Circuit has adopted a two-part test to assess the qualification of a *qui tam* relator under § 3730(e)(4). The reviewing court must first determine whether the "allegations or transactions" that form the basis for the suit were publicly disclosed "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). If the answer to that question is affirmative, the court will continue with the "original source" inquiry. *See Springfield Terminal Railway Co.*, 14 F.3d at 651.

### 1. Public Disclosure

Hamilton contends that information supporting the allegations in the amended complaint was publicly disclosed in the October 1997 newspaper articles, and in HUD's October 17, 1997 termination letter to Hamilton. Ervin attached the news reports and the letter to a pleading filed in a *Bivens* action brought against various HUD officials. In *Springfield Terminal Railway Co.*, the D.C. Circuit clarified that "for purposes of § 3730(e)(4)(A), 'hearing' is roughly synonymous with 'proceeding.'"

14 F.3d at 652. Given Ervin's filing of these materials in a civil proceeding—and given the separate publication of the articles in the news media—there is no doubt that these documents were publicly disclosed through the sources listed in § 3730(e)(4)(A).

The public disclosure analysis also requires this court to consider whether the allegations in the amended complaint are *"based upon* the public disclosure of allegations or transactions." 31 U.S.C. § 3730(e)(4)(A) (emphasis added). The HUD termination letter alleged that "Hamilton's erroneous use of the optimization model resulted in the selection of bidders that were not in accordance with the optimization model." Exh. 5 to Hamilton's Motion to Dismiss. Similarly, the October 20, 1997 article in *The Washington Times* described "possible bid-rigging in HUD note sales organized by Hamilton Securities Group," including allegations that Hamilton was "covering up 'erroneous instructions' for a computer model . . . ." Exh. 6 to Hamilton's Motion to Dismiss. In an October 21, 1997 article, *The Washington Times* reported that "Hamilton . . . taint[ed] billions of dollars worth of HUD note sales by misusing a computerized process to select winners," a process that "HUD [ ] says was known by Hamilton to be 'erroneous.' " Exh. 8 to Hamilton's Motion to Dismiss. The October 21, 1997 article also reported that officials at Black-Rock Financial Capital were given access to confidential information regarding HUD-backed mortgages. *Id.*

■ The Court finds that the allegations in the amended complaint are "based upon" these public disclosures. Circuit precedent establishes that the phrase "based upon" should be read as "supported by," not "derived from." *United States ex rel. D.J. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 682 (D.C.Cir.1997) (citation omitted). Ervin's amended complaint alleges that Hamilton, along with other entities, orchestrated a complex scheme to deprive the government of hundreds of millions of dollars. Specifically, Ervin alleged that Hamilton "was able to set up bidding rules and approaches which would allow Hamilton to direct notes to its favored Wall Street bidders." Amended Compl. at ¶ 59. In particular, the amended complaint alleged that the computerized "optimization process was structured to favor large Wall Street bidders over small bidders." *Id.* ¶ 62. The allegations in the amended complaint are "supported by" the publicly disclosed documents, which also spoke to bid-rigging and misuse of the optimization model. To be sure, Ervin's amended complaint contains additional details that are not included in these public disclosures. That fact, however, does not preclude a finding that the amended "complaint repeats what the public already knows . . . ." *Findley,* 105 F.3d at 683.

■ Ervin further argues that the alleged public disclosure must either make a public "allegation of fraud" or reveal all the essential elements of a "fraudulent transaction." *Springfield Terminal Railway Co.,* 14 F.3d at 654–55; Ervin's Memorandum in Opposition to Motion to Dismiss, at 12–15. According to Ervin, none of the information that Hamilton claims was "publicly disclosed" meets that standard. However, D.C. Circuit law holds that public disclosure of the fraudulent transaction, even without the public disclosure of the specific allegation of fraud, bars a relator. *United States ex rel. Settlemire v. District of Columbia,* 198 F.3d 913, 919 (D.C.Cir.1999) (the relevant public disclosure need not irrefutably prove a case of fraud; it is sufficient that the publicly disclosed transaction is sufficient to raise the inference of fraud). In the present case, the public disclosures do raise an

inference of fraud. The articles' numerous references to "bid-rigging" and misuse of the optimization model suggest that Hamilton knowingly made misrepresentations that caused harm to the government.

In light of the foregoing, the Court finds that information that supports the allegations in the amended complaint was "publicly disclosed" within the meaning of § 3730(e)(4)(A).[4]

### 2. "Original Source" Inquiry

Although information regarding problems with the optimization model was publicly disclosed, that does not end our inquiry. Ervin's action may nonetheless proceed if it can demonstrate that it is an "original source" of the information, as defined by § 3730(e)(4)(B). As mentioned above, in order to qualify as an "original source," Ervin must demonstrate that it had "direct" and "independent" knowledge of the fraud, and that it "voluntarily" provided information to the United States. Ervin insists that it is in compliance with these three jurisdictional requirements.

### a. Direct Knowledge

Ervin maintains that it satisfies the "direct knowledge" requirement because, through personal observation and analysis, and through its own research and investigation, it acquired knowledge of Hamilton's fraudulent conduct. Ervin's original complaint states the following about how it obtained the information contained in the complaint:

> Were it not for Ervin's knowledge of HUD and its operations, Ervin's documentation of a series of seemingly unrelated facts and occurrences through numerous FOIA requests and discussions with various HUD employees and successful and unsuccessful Wall Street bidders, and based on objective observation of the note sales process, Ervin would not have been able to piece together the causes of action alleged herein.

Orig. Compl. at ¶ 19. Similarly, the Amended Complaint makes the following representation:

> Ervin is the original source of the information alleged herein, insofar as Ervin has brought to bear its intimate knowledge of HUD operations, its observations and analyses of the mortgage loan auctions, its discussions with certain HUD employees and Wall street bidders, as well as its independent analyses of HUD's responses to numerous Freedom of Information Act requests.

Amended Compl. at ¶ 18.

Ervin has "direct knowledge" of any information gleaned from direct observation and analysis, as that information was acquired without any "intervening agency." *Alexander*, 924 F.Supp. at 300. As for

---

4. Ervin has acknowledged that it relied on Freedom of Information Act (FOIA) requests in preparing its amended complaint. Amended Compl. at ¶ 18. Although Hamilton has not raised the argument, this Court has held that documents produced in response to FOIA requests are "publicly disclosed" for purposes of the Act. *See United States ex rel. Herbert v. National Academy of Sciences,* 1992 WL 247587, at *6 (D.D.C. Sept. 15, 1992) ("Just as civil discovery is public, it must be the case that information obtained pursuant to an FOIA request has been made public through the administrative process and cannot form the basis of a *qui tam* action."). *See also United States ex rel. Mistick PBT v. Housing Authority of City of Pittsburgh,* 186 F.3d 376, 383 (3d Cir.1999); *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1520 (9th Cir.1995), *vacated on other grounds,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). *But see United States ex rel. Pentagen Technologies Int'l Ltd. v. CACI Int'l Inc.,* 1995 WL 693236, at *9 (S.D.N.Y. Nov. 22, 1995) ("documents acquired under the FOIA are not publicly disclosed within the meaning of § 3730(e)(4)(A)").

Ervin's discussions with individuals and its investigation, courts have allowed a plaintiff to proceed with a *qui tam* suit based on information uncovered during an investigation undertaken by that same plaintiff. For example, in *Springfield Terminal Railway Co.*, the D.C. Circuit held that the plaintiff qualified as an original source when it obtained essential information through "its own efforts and experience, which ... included personal knowledge of the [ ] proceedings and interviews with individuals and businesses identified in the [ ] records." 14 F.3d at 657. Similarly, Ervin's investigation of the alleged impropriety involving the note sales was facilitated by its prior experience with HUD and its expertise in housing matters. *See also Cooper ex rel. United States v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568 (11th Cir.1994) (per curiam) (finding "direct knowledge" when relator acquired information through three years of his own research prior to public disclosure); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1161 (3d Cir.1991) (stating in *dicta* that plaintiffs may qualify as relators if their information results from their own investigations); *Lamers v. City of Green Bay*, 998 F.Supp. 971, 983 (E.D.Wis.1998) (noting that "an 'investigation' undertaken at the relator's own initiative may form the basis for a qui tam action.").

#### b. *Independent Knowledge*

■ There remains the question of whether the allegations in the amended complaint were based on knowledge "independent" of any public disclosures. To be sure, between Ervin's June 1996 filing of its original *qui tam* complaint, and its filing of the amended complaint in September 1999, Ervin, Hamilton, and HUD OIG were all investigating possible errors or impropriety involving the optimization model. During this time period, Ervin continued its investigation of the note sales by conducting its own research, including several FOIA requests. Some of these requests piggy-backed upon other disclosures that had been made: for example, after more specific allegations of bid-rigging were made in a newspaper article that ran in *The Washington Times* on October 20, 1997, Ervin directed a FOIA request to HUD, requesting documents and other information referenced in the article. *See* Defendants' Exhibit from Motions Hearing. As mentioned above, it appears that at least some of the allegations in the amended complaint were supported by information that was publicly disclosed.

Ervin argues, however, that it is entitled to proceed as a relator based on the allegations in its original *qui tam* complaint, which were arguably "independent" of any public disclosures. In support of Ervin's position, this Circuit has recognized that Congress has not specified "by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator in order for suits to proceed." *Springfield Terminal Railway Co.*, 14 F.3d at 653. The *Springfield* court held that the "direct and independent knowledge" requirement "refers to direct and independent knowledge of *any* essential element of the underlying fraud transaction...." *Id.* at 657 (emphasis in original). Here, Ervin's original complaint suggested that Hamilton had acted improperly by misapplying a flawed optimization model, and by misleading the public about the fairness of the auctions. Orig. Compl. at ¶¶ 13, 79–85. In other words, Ervin's original complaint contained essential elements of the allegedly fraudulent transaction—it identified the alleged perpetrator, and the scheme in gen-

eral terms.[5]

Typically, the jurisdictional bar applies where the publicly disclosed information "'could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *Springfield Terminal Railway Co.*, 14 F.3d at 654 (quoting *United States ex. rel. Joseph v. Cannon*, 642 F.2d 1373, 1377 (D.C.Cir.1981)). As the D.C. Circuit stated in *Findley*, "the public disclosure bar [ ] limits *qui tam* jurisdiction to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware." 105 F.3d at 678. Here, Ervin's allegations, if accepted as true, indicate that Ervin disclosed core allegations of fraud that were previously unknown to the public. Importantly, there is no indication that HUD knew of any problems related to the model, or that it was investigating the same prior to June 1996. Hamilton, citing the December memoranda, maintains that *it* was the original source of information about the optimization errors. However, Ervin filed its original complaint six months before Hamilton sent the December memoranda. Although Ervin may have enhanced its case with subsequent public disclosures, its original complaint appears to have set the government "on the trail," prompting an investigation of possible improprieties involving the auctions.[6] *Fine*, 70 F.3d at 571.

---

5. The Written Disclosure of Material Evidence Pursuant to 31 U.S.C. § 3730(B)(2), which was filed with the original complaint, explains that the allegations regarding the optimization model were supported by a "[c]opy of the mathematical formula for the optimization model [and by] Ervin's analysis of the optimization model." Written Disclosure, at 3. Other allegations in the original complaint were similarly supported by individual sources, documentary evidence, and Ervin's analysis. *Id.* at 2–4. To the extent that Ervin may have relied on facially innocuous documents obtained under FOIA, such "disclosures" do not necessarily bar *qui tam* jurisdiction. As the D.C. Circuit explained in *Springfield Terminal Railway Co.*,

> [k]nowledge of the allegedly misrepresented state of affairs—which does not necessarily entail knowledge of the fact of misrepresentation—is always in the possession of the government... Publication of the facially valid [documents], already in the government's pocket, cannot by itself be sufficient to defeat *qui tam* jurisdiction. Indeed, the entire *qui tam* regime is premised on the idea that the government's knowledge of misrepresented claims against the federal fisc (without knowledge that they are misrepresented) does not in itself translate into effective enforcement of the laws against fraud.

14 F.3d at 656. Therefore, although the government had physical possession of some of these documents and turned them over pursuant to FOIA requests, Ervin's pleadings suggest that its own analysis and research brought the allegedly fraudulent activity to the government's attention.

6. Ervin's Memorandum in Opposition to Motion to Dismiss offers extensive circumstantial evidence in support of its argument that the original complaint precipitated the government investigation. Ervin also cites the Ninth Circuit's decision in *United States of America ex. rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 411 (9th Cir.1993), which held that a party "is 'an original source' with respect to a proposed amendment if he played some part, whether direct or indirect, in the public disclosure of the allegations that are the subject of the proposed amendments." In so holding, the *Barajas* court scrutinized the language and history of § 3730(e)(4)(A). Notably, the court emphasized that the Act refers to "*an* original source." *Id.* at 410 (quoting 31 U.S.C. § 3730(e)(4)(A)) (emphasis added). The use or the word "an," the court observed, "suggest[s] there may be more than one original source eligible to bring suit ...." *Id.* The reasoning espoused by the *Barajas* court lends further support for Ervin's contention that its allegations, if accepted as true, support jurisdiction in this case.

Although the court in *United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F.Supp. 1010 (E.D.Va.1995) expressed some doubt about the "trigger" theory articulated in *Ba-*

The Court is sensitive to the possibility that an opportunistic, would-be relator might make a broad, unsubstantiated allegation and later back up that allegation with specific, publicly disclosed information. However, this is not such a case. Ervin has alleged that its ·original complaint was based on, *inter alia,* first-hand observation, analysis, and investigation of the auctions at issue. The original complaint mentioned several of the parties involved in the alleged impropriety, and identified problems with the optimization model that had been allegedly misused by Hamilton.

This Court is guided by the D.C. Circuit's observation that the Act reflects Congress' attempt to find "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Springfield Terminal Railway Co.,* 14 F.3d at 649. Given that Ervin provided important information that was not previously known to the public, this balancing tips in Ervin's favor, and Ervin satisfies the jurisdictional requirement for "direct and independent knowledge."

### c. *Voluntarily Provided*

In order to qualify as an "original source," the plaintiff must have "voluntarily provided the information to the government before filing an action ...." 31 U.S.C. § 3730(e)(4)(B). Ervin argues that it "provided the information to the government long before it filed its amended complaint and long before any alleged public disclosures." Ervin's Memorandum in Opposition to Motion to Dismiss, at 18 n. 12. Ervin notes that "[t]he United States was

served both with the original complaint and a Written Disclosure of Material Evidence in June 1996." *Id.* In fact, Attachment 1 to Ervin's Amended Complaint details the information that Ervin provided before filing the amended complaint.

In any event, Ervin has satisfied the underlying purpose of the voluntary disclosure requirement. Senator Grassley, one of the authors of the 1986 Amendments, described the purpose of § 3730(e)(4)(B)'s disclosure requirement as follows:

> In the definition of 'original source,' the requirement that the individual 'voluntarily' informed the Government ... is meant to preclude the ability of an individual to sue under the *qui tam* section of the False Claims Act when his suit is based solely on public information and the individual was a source of the allegations only because the individual was subpoenaed to come forward. However, those persons who have been contacted or questioned by the Government ... and cooperated by providing information which later led to a public disclosure would be considered to have 'voluntarily' informed the Government ... and therefore considered eligible *qui tam* relators.

132 Cong. Rec. 20536 (1986). Here, the record indicates that Ervin willingly cooperated with the government (without need for a subpoena), and provided the government with information as it became available.

### IV.

Consistent with the foregoing, the Court finds that Ervin's pleadings reflect compliance with the jurisdictional requirements of § 3730(e)(4), sufficient to withstand the

---

*rajas,* it acknowledged that "the Rules do not require the complainant to have direct and independent knowledge of everything in his

complaint in order to qualify as a relator." *Id.* at 1021.

present motion to dismiss claims relating to the optimization errors.